IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

_____

THI OF NEW MEXICO AT VIDA
ENCANTADA, LLC, et. al.,

      Plaintiffs,

      v.                                              Civ. No. 11-0399 BB/ACT

CELIA ARCHULETA, as Personal
Representative for the Estate of Abelina
Lucero, deceased,

      Defendant.

## MEMORANDUM OPINION

      THIS MATTER comes before the Court on Plaintiffs' motion to compel arbitration [Doc 2]. Having reviewed the submissions of the parties and the relevant law, and for the reasons below, Plaintiffs' motion is HELD IN ABEYANCE pending resolution of the matters certified to the Supreme Court.

## Factual and Procedural Background

      Abelina Lucero, now deceased, had spent the majority of her years living independently [Doc. 48-8, Lucero Depo. at 4]. She lived in a mobile home near her grown children in Las Vegas, New Mexico, who helped her with routine necessities such as paying the bills [*id*. at 5]. However, because Lucero's mind remained sharp, she retained full control over her financial and legal decisions. She signed her own checks and paid bills from her own finances [*id*. at 14]. She neither assigned any powers of attorney, nor added her children as signatories to her bank accounts [*id*. at 6]. In 2004, Lucero, in her nineties, broke her hip and needed to be admitted to a hospital [*id*. at 9, 40]. Although the hospital provided immediate care for her hip, she needed

physical assistance while she was recovering [*id*. at 27].  Complaining that her daughter was too frail to take care of her, Lucero requested to temporarily stay in a nursing home while she recovered [*id*. at 12].

On November 22, 2004, Lucero was admitted to Plaintiffs' nursing home, THI of New Mexico at Vida Encantada ("nursing home") [Doc. 9-1 at 2].  Lucero was still mentally competent and the record reflects she executed no powers of attorney [*id.*].  Nine days later, Lucero's daughter, Celia Archuleta, signed paperwork necessary for Lucero's admittance to the nursing home [Doc.48-2].  Included in the paperwork was an admission contract containing a broad arbitration clause, written in dense legal terms  [*id.*].  The only signature on the admission contract is Archuleta's, which appears on a line denoted "Fiduciary Party" [*id.*].

Over the course of the following weeks, it became clear that Lucero would need to remain in the nursing home indefinitely, and her residency became permanent  [Lucero Depo. at 12].  Lucero and Archuleta never revisited the admitting paperwork [*id.* at 42].  For the remainder of Lucero's stay with the nursing home, Archuleta helped facilitate payment to the nursing home from Lucero's bank accounts, government benefits, and late husband's retirement benefits [*id*. at 30-31].  Neither party asserts that Lucero's mental capacity diminished [*id*. at 40]. In September, 2006, nearly two years after admittance, the nursing home asked Archuleta to provide a written power of attorney as evidence of her authority to act on her mother's behalf [*id*. at 23-26].  Archuleta got a power of attorney form from her friend [*id*. at 23-26].  Without Lucero present, Archuleta signed the form and another friend "notorized" it [*id*. at 23-26].  The parties do not claim Lucero signed the power of attorney thereafter, and the only copy submitted to the Court lacks Lucero's signature [*id*. at 27].

2

In 2009, Lucero passed away, allegedly due to the nursing home's negligence. Notwithstanding the arbitration agreement, Lucero's estate ("Estate"), represented by Archuleta, filed suit in New Mexico state court against multiple parties affiliated with the nursing home.  In response, several of these parties ("Plaintiffs") filed a suit in this Court to enforce the arbitration agreement and compel arbitration.  After the initial briefings, Plaintiffs had seemingly failed to meet their burden of proving that the parties entered into a valid arbitration agreement.  Per Plaintiffs' request, the parties conducted further discovery to supplement the record.

As discussed below, further discovery failed to reveal that Lucero actually assented to the arbitration agreement.  However, Plaintiffs assert several legal theories under which Lucero may nonetheless be bound to the arbitration agreement.  Because these theories raise novel issues of law undecided in New Mexico, certification to the New Mexico Supreme Court is appropriate for several matters [*see* "Certification Order"].  The remaining claims are resolved as explained below.

## Discussion

This case was brought pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et. seq.*  The Tenth Circuit has affirmed that when parties have validly agreed to arbitrate their claims, the Federal Arbitration Act provides a body of substantive federal law to govern those agreements, including a policy strongly in favor of arbitration.  *Zink v. Merrill Lynch Pierce Fenner & Smith*, 13 F.3d 330, 334 (10th Cir. 1993).  However, a court must first determine whether a valid arbitration agreement was executed.  A court applies a standard similar to the summary judgment standard, and construes all facts and reasonable inferences in favor of the non-moving party.  *Bensadoun v. Jobe-Riat,* 316 F.3d 171, 175 (2d Cir. 2003);  *Stepp v. NCR*

3

*Corp.,* 494 F. Supp. 2d 826, 829 (S.D. Ohio 2004).  A federal court sitting in diversity

jurisdiction applies state law to determine whether a valid arbitration agreement was made.

*Avedon Eng'g Inc. v. Seatex,*126 F.3d 1279, 1287 (10th Cir. 1997).  In New Mexico, "the party

attempting to compel arbitration carries the burden to demonstrate a valid arbitration

agreement."  *Corum v. Roswell Senior Living*, LLC, 248 P.3d 329, 331 (N.M. App. 2010).


## I.   PERSONAL AGREEMENTS AND UNCLEAN HANDS

To demonstrate the Estate agreed to arbitration, Plaintiffs allege that the Estate's

representative, Archuleta, directly contracted to arbitrate the Estate's claims when she signed the

admitting paperwork.  Plaintiffs also allege that Lucero's and Archuleta's conduct amounts to

"unclean hands," such that they cannot now deny the agreement.  Neither theory is availing.


## A.   Archuleta's Personal Agreements Are Not Binding Upon the Estate

Plaintiffs first allege the Estate is bound to the arbitration agreement because when

Archuleta admitted her mother to the nursing home, Archuleta signed the admission contract in

her individual capacity as the "fiduciary party."  When Archuleta signed the admission contract,

five years prior to her mother's passing, she was not acting on behalf of her mother's Estate.

The Estate cannot be bound to a contract based actions on that Archuleta took in her individual

capacity.  *See Lewis v. Dairyland Ins. Co.*, 831 P.2d 985, 987 (N.M. 1992); *Dickerson v.

Longoria*, 995 A.2d 721, 743 (Md. 2010).  While Plaintiffs rightfully conclude that this signature

can bind Archuleta to a valid[1] arbitration agreement in her individual capacity, Archuleta is not

individually named as a defendant in this case.  She is also not a party to the underlying state

---

[1] The parties dispute whether the arbitration agreement is valid.  *See infra* Part III.

suit, which was brought only by the Estate, and includes no claims personal to Archuleta. Instead, the Estate is the sole defendant in this suit. The circumstance that Archuleta is now also the personal representative for the Estate is of no moment. *See id.*

## B.    Lucero and Archuleta Do Not Have Unclean Hands

"Unclean hands" is the equitable doctrine that prevents a complainant from recovering where she "has been guilty of fraudulent, illegal or inequitable conduct in the matter with relation to which he [or she] seeks relief." *Magnolia Mountain LP v. Ski Rio Ptnrs.*, 131 P.3d 675, 685 (N.M. Ct. App. 2005) (quoting *Home Savs. & Loan Ass'n v. Bates*, 417 P.2d 798, 799 (N.M. 1966)). Here, Plaintiffs allege that Lucero and Archuleta accepted the benefit of the nursing home's care for several years, thus they no longer have "clean hands" to refute the underlying agreement which secured that care. Plaintiffs also allege that at the outset, Lucero was only able to secure residence with the home through false promises to arbitrate any claims.[2]

As a primary matter, Plaintiffs again seem to conflate Archuleta's role as an individual with her role representing the Estate. As has been discussed, the Estate took no part in admitting Lucero to the nursing home, and Archuleta's conduct in her individual capacity cannot now be imparted to the Estate. More significant is the lack of improper conduct by either Archuleta or Lucero. Neither Archuleta nor Lucero fraudulently misrepresented her position, or otherwise

---

[2] Plaintiffs assert that the arbitration agreement was a mandatory precondition for admittance to the nursing home, and that if they had any cause to doubt the agreement, they would not have admitted her. However the record contains significant evidence to the contrary: the arbitration agreement was not signed until nine days after Lucero was admitted; Plaintiffs never evidenced a review of the contract; Plaintiffs took no steps to ask Lucero directly if she agreed to the contract; Plaintiffs took no steps to ensure that Archuleta was validly acting on her mother's behalf; and when Plaintiffs finally did inquire into Archuleta's authority several years later, they were satisfied by the unsigned and unnotorized power of attorney that she produced.

5

acted inequitably, by signing the admission contract and doing business with the nursing home for several years.  Indeed, neither Lucero nor Archuleta realized they were being asked to waive their trial rights.  Lucero was not even aware of the arbitration agreement.  Archuleta, meanwhile, was not represented by counsel, had no more than a high school education, and did not realize the meaning of "arbitration."  Nowhere does the agreement define arbitration, use the words "trial" or "jury," or explain that the agreement has the effect of barring the right to a jury trial.  The agreement is instead a single sentence, ten lines long, written in dense legalistic terms.

Based on the record evidence, it appears no one from the nursing home explained the arbitration agreement -- or anything else in the admission contract -- to Archuleta or Lucero. Thus Archuleta and Lucero were not attempting to mislead the nursing home when they followed the nursing home's orders to "sign here, sign here, sign here" [Lucero Depo. at 50]. *See Strausberg v. Laurel Healthcare Providers, LLC*, 269 P.3d 914, 920 (N.M. Ct. App. 2011) (commenting that when individuals are admitted to a nursing home, they are "often at their most vulnerable, emotionally or physically, or both").  There are thus too many factual inconsistencies in the record to conclude that the Estate is bound by unclean hands.

## II.   AGENCY AND THIRD-PARTY BENEFICIARY

## A.   Lucero May Be Bound to the Arbitration Agreement Under Principal-Agent Theory

"An agent is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair or does some service for the principal, with or without compensation."  *Tercero v. Roman Catholic Diocese*, 48 P.3d 50, 55 (N.M. 2002).  An agent's authority is created when the principal clearly expresses her intentions to have the agent act on her behalf.  *Diversified Dev. & Inv. v. Heil*, 889

P.2d 1212, 1219-20 (N.M. 1995).  This authority may be actual or apparent.  *Tercero*, 48 P.3d at

55.  Actual authority arises from manifestations by the principal to the agent.  *Barron v.*

*Evangelical Lutheran Good Samaritan Soc'y*, 265 P.3d 720, 725 (N.M. App. 2011).  Apparent

authority, on the other hand, arises from manifestations by the principal to the relying third

party.  *Id.*  In both cases, when the principal grants another authority to do certain acts, "those

acts become binding on the principal because they are treated as the acts of the principal."

*Diversified*,  889 P.2d at 1219.


1.  Archuleta Had No Apparent Authority to Agree to Arbitration

      Plaintiffs primarily contend that Archuleta had apparent authority to agree to arbitration.

Apparent authority exists when a principal holds out another as possessing the authority of an

agent.  *Romero*, 784 P.2d at 996.[3]  It is well established that "[a]pparent authority arises from

manifestations by the principal to the third party."  *Diversified,* 889 P.2d at 1218.  To establish

apparent authority, Plaintiffs "must base the relationship upon words or acts of the principal, and

not the representations or acts of the agent."  *Tercero*, 48 P.3d at 56 (internal quotations

omitted).  A third party must use reasonable diligence to ascertain whether an agent acts within

the scope of her authority, and can only rely on the appearance of authority so far as it is

_____

    [3]  Typically, though not always, apparent authority is found only after actual authority
has been established, and serves only to expand the scope of the actual authority.  *See, e.g.,*
*Romero*, 109 N.M. at 253-254 (store manager with actual authority to deal with customer
injuries also has apparent authority to promise the store will pay for a customer's injuries); *Fryar*
*v. Employers Ins.*, 94 N.M. 77, 81 (N.M. 1980) (insurance broker with limited actual authority
also has apparent authority to modify an insurance contract for an insurance company);
*Comstock v. Mitchell*, 793 P.2d 261, 262 (1990) (after finding actual authority, court engaged in
a factual inquiry to determine whether apparent authority expanded the scope of authority);
*Diversified*, 889 P.2d at 1218 (same); *Tercero*, 48 P.3d at 56 (same).  However, there is no rule
stating that this must necessarily be so.

reasonable. *Barron*, 265 P.3d at 725. Plaintiffs here must show that they reasonably relied on the words or acts of Lucero, and not those of Archuleta, when they allowed Archuleta to sign the arbitration agreement on her mother's behalf. *See Tercero,* 48 P.3d at 56.

Lucero never presented Archuleta as having authority to make arbitration agreements on Lucero's behalf. Plaintiffs rely heavily on Archuleta's signatures on various forms in the admitting paperwork as proof of her apparent authority. However, "[t]he unauthorized statements of an agent to the third party concerning the existence or extent of [her] authority cannot be relied upon to establish apparent authority." *Diversified*, 889 P.2d at 1220 (internal citations omitted). Because Archuleta is not the principal, her manifestations create no appearance of authority. *Cf. Barron*, 265 P.3d at 722 (apparent authority found when a nursing home patient directly told the nursing home who would complete paperwork on her behalf, and confirmed the following day with a written healthcare power of attorney).

For similar reasons, Archuleta was not imbued with the appearance of authority when she signed other paperwork for Lucero; namely the forms signed at an independent hospital several days prior to moving to the nursing home,[4] and a state medicaid application signed well after.[5] First, Plaintiffs do not claim they relied on, or even saw, these forms when they decided to admit Lucero to the nursing home. Second, none of the signatures on these forms were manifestations made by Lucero. There is no evidence that Lucero told Plaintiffs her daughter had authority to sign these forms. There is not even evidence that Lucero told Plaintiffs she was aware her

---

[4] Lucero Depo. at 9-10:
Q. She never knew that you signed papers on her behalf at the hospital?
A. She had to go into the hospital. I didn't– she didn't know. Somebody had to do it, no choice, you know.

[5] Doc. 48-7 at 2, signed by Archuleta and dated May 27, 2005.

8

daughter had been signing these forms.  Because the focus of the inquiry is on manifestations to the third party made by the principal, these signatures do not establish apparent authority.  *See Diversified*, 889 P.2d at 1218.

Similarly, although Archuleta helped her mother with small tasks in the years prior to her admission to the nursing home, none of these tasks created the appearance of authority. Plaintiffs do not claim they relied on this arrangement, or even knew about it, when deciding to admit Lucero to the nursing home.  *See Diversified*, 889 P.2d at 1218.  Furthermore, these tasks amounted to little more than bringing Lucero's mail to her mobile home.[6]  Although the mail at times included bills, Lucero paid her own bills by drafting and signing her own checks from her own bank accounts.  Thus this arrangement did not give Archuleta the appearance of being Lucero's agent.

Finally, third parties "must use reasonable diligence and prudence to ascertain whether the agent is acting within the scope of [her] powers."  *Comstock v. Mitchell*, 793 P.2d 261, 262 (N.M. 1990) (internal quotations omitted).  Plaintiffs took no action to determine whether Archuleta actually had authority to sign the arbitration agreement on Lucero's behalf.  Nor were they concerned when, several years later, they received a power of attorney that was unsigned and not legally notarized.

---

[6] Because Lucero lived in a mobile home, she had her mail sent to Archuleta's house. When the mail included bills, Archuleta brought them to Lucero, who paid them with her own finances.  This continued after Lucero moved to the nursing home.

2.  Whether Archuleta Had Actual Authority to Agree to Arbitration Cannot be Determined

There is no evidence in the record of Lucero's express authorization to have Archuleta act as her legal agent.  The only form purporting to designate power of attorney to Archuleta was drafted years after Lucero entered the nursing home, and was not signed by Lucero [Doc. 48-8].  Lucero also never expressly authorized Archuleta to act as her agent for the specific purpose of signing the nursing home's admitting paperwork.  However, there is evidence of Lucero's implied authorization to have Archuleta sign the admission contract on her behalf.  Lucero clearly desired to be admitted to the nursing home, and she routinely allowed her daughter to sign financial paperwork on her behalf [Lucero Depo. at 10-12].  However, the law in New Mexico is unclear whether this likewise implies Lucero's authorization to have Archuleta make legal decisions on her behalf.  *See Corum*, 248 P.3d at 336 (declining to hold whether the authority to admit another to a nursing home includes authority to sign an arbitration agreement).  Therefore, this matter has been certified to the New Mexico Supreme Court.

**B.**      **Lucero May Be Bound by the Arbitration Agreement Under the Third-Party Beneficiary Doctrine**

Plaintiffs assert that Lucero was bound to the arbitration agreement under the third-party beneficiary doctrine.  This doctrine is undeveloped in New Mexico, and the matter has been certified to the New Mexico Supreme Court for resolution.

C.      **The Estate May Be Bound by Lucero's Agreements**

If application of the above doctrines binds Lucero to the arbitration agreement, the question remains whether it likewise binds her Estate.  This issue is also unresolved in New Mexico and has also been certified to the Supreme Court.

III.    **MATTERS PREMATURE FOR JUDGMENT:  ESTOPPEL, SCOPE, AND ENFORCEABILITY**

Plaintiffs assert that regardless of a valid contract, the Estate is bound to the arbitration agreement under promissory estoppel.  Promissory estoppel makes a promise binding when the promisees (here, Plaintiffs) have detrimentally relied on a promise, but their detriment is not a valid form of consideration.  *See* 17A Am Jur 2d *Contracts* § 109.  Although promissory requires clear proof of a promise, here, the only evidence of a promise to arbitrate is the admission contract itself.  Thus promissory estoppel cannot be resolved until the other issues regarding the validity of the contract are resolved.

The Estate challenges both the scope and the enforceability of the arbitration agreement. More specifically, while Vida Encantada is clearly a contracting party, the Estate alleges the remaining Plaintiffs cannot be covered by the arbitration agreement which, by its terms, extends only to the "agents, employees, or representatives" of the contracting parties.  The Estate further contends that the arbitration agreement is not enforceable for three reasons:  first, it is unconscionable; second, by the terms of the contract, all agreements within the contract expired at Lucero's death; and third, the arbitration agreement is not supported by valid consideration.

Until such time as the arbitration agreement can be deemed binding on the Estate, the Court will withhold judgment on the agreement's scope and enforceability.  *See Rio Grande Kennel Club v. City of Albuquerque*, 144 N.M. 636, 645 (N.M. App. 2008) ("The doctrine of

ripeness is intended to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.") (quoting *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1237 (10th Cir. 2004)) (internal quotations omitted).


## <u>Conclusion</u>

Neither direct agreements nor unclean hands bind the Estate to the arbitration agreement. However, the Estate might nonetheless be bound to the arbitration agreement as third-party beneficiary or as a principal acting through an agent.  Several issues critical to resolving these arguments  have been certified to the New Mexico Supreme Court for resolution.  The Supreme Court's decision may moot the remaining issues before this Court, namely the scope and enforceability of the arbitration agreement.  Therefore, Plaintiffs' motion to compel arbitration is held in abeyance pending the Supreme Court's resolution of the matters herein certified.


Dated this 10th day of April, 2012

_____
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE