## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

THI OF NEW MEXICO AT VIDA
ENCANTADA, LLC, THI OF NEW
MEXICO, LLC, FUNDAMENTAL
ADMINISTRATIVE SERVICES, LLC, and
FUNDAMENTAL CLINICAL
CONSULTING, LLC,

       Plaintiffs,

v.                                                                    No. Civ. 11-399 LH/ACT

CELIA ARCHULETA, as the Personal
Representative for the Estate of Abelina
Lucero, deceased,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

On May 9, 2011, Plaintiffs THI of New Mexico at Vida Encantada, LLC ("Vida Encantada" or "nursing home"); THI of New Mexico, LLC ("THI-NM"); Fundamental Administrative Services, LLC ("FAS"); and Fundamental Clinical Consulting, LLC ("FCC") (collectively, "Plaintiffs") filed a Motion to Compel Arbitration (Doc. 2). Plaintiffs request an order under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, compelling Defendant Celia Archuleta ("Defendant" or "Ms. Archuleta" or "the Estate") to arbitrate claims that she has asserted on behalf of her deceased mother, Abelina Lucero, against Plaintiffs in the Fourth Judicial District Court of New Mexico, *Lucero v. Fundamental Long-Term Care Holdings, LLC, et al.*, D-412-CV-2011-137 ("State Court Action"). Plaintiffs contend the claims in the State Court Action are subject to a binding, written arbitration agreement (the "Arbitration Agreement"). Plaintiffs also seek an order under 9 U.S.C. § 3 staying all further proceedings in this case and the State Court Action until such arbitration has occurred in accordance with the terms of the

Arbitration Agreement.   The Court, having considered the motion, briefs, supplemental authority, arguments, evidence, relevant law, and otherwise being fully informed, concludes that Plaintiffs' motion to compel arbitration will be granted in part to compel arbitration between the Estate and Vida Encantada and THI-NM, but will otherwise be denied.

## I.      BACKGROUND

Abelina Lucero, now deceased, had spent the majority of her years living independently. *See* Decl. of J. Jonathan Hlavinka, Ex. A ("Dep. of Celia M. Archuleta") (Doc. 48-1) at 4.   She lived near her grown children in Las Vegas, New Mexico, who helped her with routine necessities such as paying the bills.  *See id.* at 4-5.  For over thirty years, Ms. Lucero routed her mail to the home address of her daughter, Celia Archuleta.  *See id.* at 4-5.  Ms. Archuleta brought the bills to her mother, instructed her to sign checks to cover the payments, and then mailed them for her mother.  *See id.* at 14-15.  Ms. Lucero signed her own checks and paid bills from her own finances.  *See id.* at 5, 14.  Ms. Lucero relied on her husband's retirement and social security for her income.  *See id.* at 5.   Her daughter Celia Archuleta was not a signatory on her bank accounts.  See *id*. at 6.

In September 2004, Ms. Lucero, in her nineties, broke her hip and needed to be admitted to a hospital.  *See id*. at 9, 27, 40; Defs.' Resp., Ex. A ("Aff. of Celia Archuleta") (Doc. 9-1) ¶ 2. Although the hospital provided immediate care for her hip, she needed inpatient rehabilitation while she was recovering.  *See* Dep. of Celia M. Archuleta (Doc. 48-1) at 12, 27; Aff. of Celia Archuleta (Doc. 9-1) ¶ 3.  Her doctor recommended the Vida Encantada nursing home as the best place for her to go.  Dep. of Celia M. Archuleta (Doc. 48-1) at 51.   In 2004, there were three nursing homes in Las Vegas:  Brookhaven, Vida Encantada, and Meadows, the State Behavioral Health Center.  Aff. of Celia Archuleta (Doc. 9-1) ¶¶ 8-9.  At the time Ms. Lucero was in the

hospital, Ms. Archuleta had heard from someone she knew that Brookhaven did not have any beds available, and Ms. Archuleta did not prefer Meadows out of concern that some people with criminal records lived there.  *Id.*; Dep. of Celia M. Archuleta (Doc. 48-1) at 51.

On November 22, 2004, Lucero moved into Vida Encantada.  Aff. of Celia Archuleta (Doc. 9-1) ¶ 11.  Lucero was still mentally competent and sharp and the record reflects she executed no powers of attorney.  *See id.* ¶¶ 13, 23.  Nine days later, on December 1, 2004, Celia Archuleta signed paperwork necessary for Ms. Lucero's admittance to the nursing home.  *See* Compl. to Compel Arbitration, Ex. A ("Admission Contract") (Doc 1-1); Dep. of Celia M. Archuleta (Doc. 48-1) at 16.  Ms. Lucero did not know that her daughter signed the contract on her behalf.  *See* Dep. of Celia M. Archuleta (Doc. 48-1) at 9-10.  Ms. Lucero never gave express, verbal, or written permission for her to do so.  *Id.* at 47, 61-62.  No one from the nursing home asked Ms. Archuleta whether she had the authority to sign the forms on her mother's behalf.  *Id.* at 63.  Ms. Archuleta, however, usually would sign hospital paperwork for her mother, and Ms. Lucero never objected to her doing so.  *See id.* at 10-11.  Ms. Archuleta believed she had the authority to sign the contract on behalf of her mother.  *Id.* at 19-20.  Ms. Archuleta did not read the Admission Contract before she signed it.  *See id.* at 18.  Instead, a nursing home employee would make an X and tell her to sign here, here, and here, so Ms. Archuleta did not look at any of the pages other than where she signed.  *See id.* at 54, 57-58.

The Admission Contract states that it is "by and among Vida Encantada . . . (the 'Health Care Center'), and Abelina Lucero ('Patient/Resident'), and/or _____ ('Fiduciary Party'), if any."  Admission Contract (Doc. 1-1) at 2 of 7.  The contract provides that the "Fiduciary Party may act in more than one capacity and shall be bound by the applicable terms and conditions of this Contract."  *Id.*  According to the contract, the Fiduciary Party acts on

behalf of the patient and pays fees and charges incurred on behalf of the patient from the patient's assets or estate.  *Id.*

The Admission Contract further provides:  "Admission of the Patient/Resident is based on the representations contained in the admission documents.  The Patient/Resident and Fiduciary Party represent that the statements made in all admissions documents are true, correct and complete without omissions of any material facts."  *Id.* at 5 of 7.  Additionally, the Admission Contract contains a termination clause that states that the contract terminates upon the patient's transfer to another facility for appropriate care, unless accommodations are reserved as provided in the Contract Addendum, and further provides:  "If Patient/Resident passes away, this Contract shall terminate on the day of Patient's/Resident's death."  *Id.*

Included in the Admission Contract is the following clause:

## VI. ARBITRATION

Pursuant to the Federal Arbitration Act, any action, dispute, claim, or controversy of any kind (*e.g.*, whether in contract or in tort, statutory or common law, legal or equitable, or otherwise) now existing or hereafter arising between the parties in any way arising out of, pertaining to or in connection with the provision of healthcare services, any agreement between the parties, the provision of any other goods or services by the Health Care Center or other transactions, contracts or agreements of any kind whatsoever, any past, present or future incidents, omissions, acts, errors, practices, or occurrence causing injury to either party whereby the other party or its agents, employees or representatives may be liable, in whole or in part, or any other aspect of the past, present, or future relationships between the parties shall be resolved by binding arbitration administered by the National Health Lawyers Association (the "NHLA").

**THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTOOD THIS CONTRACT, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO ALL OF ITS TERMS**

*Id.* at 6 of 7.

The only signature on the Admission Contract is Ms. Archuleta's, which appears on a line denoted "Fiduciary Party" at the end of the document.  *Id.* at 7 of 7.  The signature line for

the "Patient/Resident" is blank, as is the signature line for the "Health Care Center Representative." *Id.* at 6-7 of 7.

Under Ms. Archuleta's signature is the statement:   "Fiduciary Party executes this Contract in the capacity(y)(ies) checked below. . . ."  *Id.* at 7 of 7.  There are eight main boxes describing the following capacities:  court-appointed guardian, attorney-in-fact under power of attorney, court-approved conservator of estate, trustee under written trust agreement, personal representative designated in writing under Social Security Act, Legal Representative as defined by Omnibus Reconciliation Act of 1987, representative payee within meaning of Social Security Act, or Immediate Family Member.  *Id.*  None of the boxes is marked.  *Id.*

The same day Ms. Archuleta signed the Admission Contract, she signed as "Fiduciary Party" an Admissions Contract Addendum, which generally obligated the patient to pay for charges not covered by Medicare and allowed the Medicare Program to reimburse Vida Encantada.  *See* Decl. of William Chaltry, Ex. B (Doc. 4-2) at 2-4 of 10.  Ms. Archuleta also signed on the line "Patient's/Resident's Signature" a Right to Self-Administration of Drugs form, which deferred the responsibility of self-determination of medications to the health care center. *Id.*, Ex. B (Doc. 4-2) at 5 of 10.  Additionally, Ms. Archuleta signed the following documents: Consent for Treatment for nursing and medical care provided by Vida Encantada; Personal Services Request regarding laundry, mail, and supply services; Acknowledgment of Receipt of the Notice of Privacy Practices; Facility Statement that authorized payment of medical benefits and release of medical information to Vida Encantada for services provided; and an Authorization for Facility to Allow Resident to Leave Facility Accompanied by its Employees. *See id.*, Ex. B (Doc. 4-2) at 6-10 of 10.

Over the course of the following weeks, it became clear that Ms. Lucero would need to remain in the nursing home indefinitely, and her residency became permanent.  *See* Dep. of Celia M. Archuleta (Doc. 48-1) at 12.  Ms. Lucero made the decision that she needed long-term care and approved the decision to remain at Vida Encantada.  *Id*.  It was important to both mother and daughter that Ms. Lucero live near her family.  *See id.* at 42; Aff. of Celia Archuleta (Doc. 9-1) ¶ 7.

Ms. Lucero and Ms. Archuleta never revisited the admitting paperwork.  *See* Dep. of Celia M. Archuleta (Doc. 48-1) at 42.  Ms. Archuleta never discussed with her mother that she signed the admission paperwork or the contents of them.  *See id.* at 60.  For the remainder of Ms. Lucero's stay at the nursing home, Ms. Archuleta helped facilitate payment to the nursing home from Ms. Lucero's bank accounts, government benefits, and late husband's retirement benefits by receiving the bills from Vida Encantada and taking the bills and Social Security check to Vida Encantada.  *See id.* at 27-31.  The retirement checks were in Ms. Lucero's name and mailed to Vida Encantada.  *See id.* at 46.  The Social Security checks were also in Ms. Lucero's name.  *See id.* at 46-47.  When Ms. Archuleta took the checks to the facility, she just gave them to the clerk in front and did not know what became of them after that.  *See id.* at 46-47.  Ms. Lucero never objected to Ms. Archuleta providing the checks to Vida Encantada.  *See id.* at 13-14.

At some point, Ms. Archuleta also applied for Medicaid through the State of New Mexico on her mother's behalf.  *See id.* at 33.  Ms. Archuleta advised her mother that she was applying, and Ms. Lucero never objected.  *Id.* at 36.  Vida Encantada sent Ms. Archuleta a letter dated September 16, 2005, notifying her that the application for state assistance had been denied and enclosing a statement of charges for Ms. Lucero's care.  *See* Decl. of J. Jonathan Hlavinka, Ex. F

(Doc. 48-6).  Ms. Lucero never knew that Ms. Archuleta filled out any paperwork on her behalf to get her Medicaid.  *See* Dep. of Celia M. Archuleta (Doc. 48-1) at 60-61.

Neither party asserts that Ms. Lucero's mental capacity diminished.  *See id*. at 40.  Even as of April 2008, when her mother was 100 years old, she was mentally competent and able to make decisions for herself.  *Id.*

In September 2006, nearly two years after admittance, the nursing home asked Ms. Archuleta to provide a written power of attorney.  *See id*. at 22-27.  Ms. Archuleta got a power-of-attorney form from a friend.  *See id.* at 23-26.  The only copy submitted to the Court lacks Ms. Lucero's signature.  *See* Decl. of J. Jonathan Hlavinka, Ex. H ("Power of Attorney") (Doc. 48-8). Instead, the Power of Attorney bears the signature of Leticia Duran as the "Notary Public" under the line, "The foregoing instrument was acknowledged before me on this 15th day of September 2006, by Celia Archuleta & Abelina Lucero."  *Id.*  No other signatures, however, appear on the document.  *Id*.  It is unclear from the record whether Ms. Lucero signed the power of attorney thereafter.  *See* Dep. of Celia M. Archuleta, Ex. A (Doc. 48-1) at 26-27, 49.

While Ms. Lucero lived at Vida Encantada, Ms. Archuleta used her own personal funds to pay for the household expenses for Ms. Lucero's home.  *See id.* at 28-29.  Ms. Archuleta would retrieve Ms. Lucero's bank statements from her home address and balance the statements for her.  *Id.* at 8.  Ms. Lucero never objected to this practice.  *Id.*

On September 25, 2009, Lucero passed away.  *See* Compl. to Compel Arbitration, Ex. B ("State Court Complaint") (Doc. 1-2) ¶ 34; Pls.' Mem. (Doc. 3) at 5 (not contesting fact). Notwithstanding the arbitration agreement, Ms. Archuleta, on behalf of Ms. Lucero's estate ("Estate") and as the personal representative, filed suit in the Fourth Judicial District Court of New Mexico, *Lucero v. Fundamental Long-Term Care Holdings, LLC, et al.*, D-412-CV-2011-137,

against Vida Encantada and multiple parties affiliated with the nursing home. *See* State Court Compl. (Doc. 1-2). In the State Court Action, the Estate sued for wrongful death, negligence, negligence per se, misrepresentation, and punitive damages. *Id.* In response, several of the defendants in the State Court Action, Vida Encantada, THI-NM, FAS, and FCC, filed a suit in this Court to enforce the arbitration agreement and compel arbitration. Simultaneously, Plaintiffs filed a motion to compel arbitration (Doc. 2).

## II.    PROCEDURAL HISTORY

After the initial briefing on the motion to compel, per Plaintiffs' request, the parties conducted further discovery to supplement the record on the issue of whether the parties entered into a valid arbitration agreement. On January 27, 2012, the Honorable Bruce D. Black entered an Order permitting discovery for the limited purpose of addressing whether Ms. Lucero consented to or ratified the Arbitration Agreement. *See* Order (Doc. 41). Subsequently, after engaging in limited discovery, the parties submitted briefs supplementing the record. *See* Pl.'s Mem. to Supplement the Record (Doc. 47); Def.'s Supplemental Materials (Doc. 49).

On May 10, 2012, Judge Black entered a Certification Order *sua sponte*. *See* Certification Order (Doc. 52). He certified four questions to the New Mexico Supreme Court:

> (I) Is agreeing to arbitration within the scope of authority implicitly granted to an agent authorized to admit a resident to a nursing home?
> (II) Can an individual be deemed the third-party beneficiary of a contract that secures her own nursing home residency in exchange for payments for which she is solely liable?
> (III) Can a third-party beneficiary be bound to the arbitration clause of a contract, when the third-party beneficiary does not seek rights under the contract?
> (IV) When a decedent is personally bound by an arbitration agreement, which, if any, of her estate's wrongful death claims must be arbitrated?

*Id.* at 1-2. In the Certification Order, Judge Black found that the record showed Ms. Lucero was mentally competent and had assigned no powers of attorney. *Id.* at 2. In addition, he determined

8

that Ms. Archuleta "had implied authority to admit Lucero to a nursing home," although he also noted that "there is no evidence of Lucero's express or implied consent to her daughter's authority to agree to arbitration." *Id.* at 3.

The Honorable Bruce D. Black also filed a Memorandum Opinion (Doc. 53) holding in abeyance Plaintiffs' motion to compel pending resolution of the matters certified to the New Mexico Supreme Court. Judge Black nevertheless resolved several issues in his Memorandum Opinion. First, Judge Black ruled that, when Ms. Archuleta signed the admission contract in her individual capacity as the "fiduciary party," she was not acting on behalf of the Estate, and thus, the Estate cannot be bound to the contract solely based on actions Ms. Archuleta took in her individual capacity. Mem. Op. (Doc. 53) at 4-5. Second, Judge Black concluded that neither Ms. Lucero nor Ms. Archuleta had unclean hands, after finding that neither engaged in any improper conduct. *Id.* at 5-6. Third, Judge Black determined that Ms. Archuleta did not have apparent authority to agree to arbitration. *Id.* at 7-9. In addition to those issues certified to the New Mexico Supreme Court, Judge Black reserved ruling on the following issues: (i) whether the Estate is bound to the arbitration agreement under promissory estoppel; (ii) whether the scope of the agreement covers THI-NM, FAS, and FCC; and (iii) whether the arbitration agreement is unenforceable because it is unconscionable, the terms expired upon Ms. Lucero's death, and it is not supported by valid consideration.

After initially accepting the certification request and hearing oral argument, the New Mexico Supreme Court quashed its certification on December 27, 2012. *See* Order (Doc. 60). The parties subsequently submitted supplemental briefing. *See* Pls.' Am. Supp. Mem. (Doc. 64); Def.'s Supp. Br. (Doc. 65). The remaining issues are now ripe for decision.

**III.    STANDARD**

The Federal Arbitration Act ("FAA") provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . *shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract*.

9 U.S.C. § 2 (emphasis added).  Arbitration agreements may thus be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability.  *Rent-A-Center, West, Inc. v. Jackson*, __ U.S. __, 130 S.Ct. 2772, 2776 (2010).

Congress's purpose in enacting the FAA was "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts."  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991).  The FAA thus "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate."  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).

The FAA "provides two parallel devices for enforcing an arbitration agreement:  a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4."  *Moses H. Cone Memorial Hosp.*, 460 U.S. at 22.  Under Section 4 of the FAA, a court may order the parties to arbitrate "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue."  9 U.S.C. § 4.  When the making of an arbitration agreement is at issue, the court must proceed to the trial of that issue.  *Id.*  A court should only decide as a matter of law whether the parties entered into an agreement to arbitrate when there is no genuine issue of material fact concerning

the formation of the agreement.  *See Avedon Engineering, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997); *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980).  When faced with a motion to compel arbitration that is opposed based on whether an agreement to arbitrate has been made between the parties, the court must give to the opposing party the benefit of all reasonable doubts and inferences that may arise.  *See Par-Knit Mills*, 636 F.2d at 54.

In enacting the FAA, Congress did not intend to force parties to arbitrate in the absence of an agreement, and therefore the "existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked."  *Avedon*, 126 F.3d at 1286-87. When the parties dispute the existence of a valid arbitration agreement, the presumption in favor of arbitration disappears.  *Dumais v. American Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002).  Consequently, a federal court looks to state law principles of contract formation to determine whether an agreement to arbitrate had been reached:

> In applying state law, [a] court may not . . . construe [an arbitration] agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law.  However, it is only when [a] state-law principle . . . takes its meaning precisely from the fact that a contract to arbitrate is at issue that the state law will be preempted by the FAA.

*Avedon*, 126 F.3d at 1287 (internal quotations and citations omitted).  Thus, courts generally apply state law on the formation of contracts to determine whether a party agreed to arbitrate a dispute.  *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006).  "A party seeking judicial enforcement of a contract bears the burden of persuasion."  *Farmington Police Officers Ass'n Communication Workers of America Local 7911 v. City of Farmington*, 2006-NMCA-077, ¶ 16, 137 P.3d 1204.

## IV.    ANALYSIS

11

**A.    The Estate and Vida Encantada Entered Into a Valid Agreement to Arbitrate**

The Admission Contract, and the Arbitration Clause therein, was signed by only one person, Ms. Archuleta, who is not technically the party to this lawsuit, although she is the named personal representative bringing suit on the Estate's behalf.  This case thus requires the Court to determine whether a valid agreement to arbitrate exists between the parties in this case where none of the parties signed the contract.  Despite the peculiarity of this situation, state law permits enforcement of the arbitration clause contained within the Admission Contract by Plaintiff Vida Encantada and THI-NM against the Estate.

**1.    Vida Encantada's failure to sign the contract does not preclude enforcement of the contract**

"For a contract to be legally valid and enforceable, it must be factually supported by an offer, an acceptance, consideration, and mutual assent."  *Heye v. American Golf Corp., Inc.*, 2003-NMCA-138, ¶ 9, 80 P.3d 495.  A party may manifest her assent to an offer by written or spoken words or by other acts or failures to act.  Restatement (Second) of Contracts § 19 (1981).  The purpose of a signature is generally to show mutuality or assent.  *Integrated Health Servs. of Green Briar, Inc. v. Lopez-Silvero*, 827 So.2d 338, 339 (Fla. Dist. Ct. App. 2002).  A contract, to be specifically enforced, however, need not necessarily be signed by the party seeking to enforce it.  *See Borel v. Mead*, 3 N.M. 39, 2 P. 222, 223 (1884) ("So it is also held not to be necessary to the specific performance of a written agreement that it should be signed by the party seeking to enforce it. If the agreement is certain, fair, and just in all its parts, and signed by the party sought to be charged, that is sufficient.").  *See also Hemispherx Biopharma, Inc. v. Mid-South Capital, Inc.*, 690 F.3d 1216, 1225 (11th Cir. 2012) ("Under Georgia law, a party's conduct may bind him to the terms of a contract, even if he does not sign the agreement."); *Lopez-Silvero*, 827 So.2d at

339 ("A contract may be binding on a party despite the absence of a party's signature.") (quoting *Gateway Cable T.V., Inc. v. Vikoa Const. Corp.*, 253 So.2d 461, 463 (Fla. 1st DCA 1971)).  A party's acts or conduct may manifest his assent to terms of an offer, so long as the party performing the act is aware of the offer and aware that his conduct could constitute acceptance. *See DeArmond v. Halliburton Energy Servs., Inc.*, 2003-NMCA-148, ¶ 17, 81 P.3d 573 (citing Restatement (Second) of Contracts § 19(2) (1981)).

It is undisputed that an employee of Plaintiff Vida Encantada presented to and offered Ms. Archuleta a form contract entitled "Admission Contract" which stated that it was by and among Vida Encantada and Ms. Lucero.  The facts show that Ms. Archuleta knew or had reason to know that the parties listed as parties to the contract were assenting to the Admission Contract. After all, Vida Encantada had already physically admitted Ms. Lucero into the nursing home, and Ms. Lucero and Ms. Archuleta both wanted her to be admitted.  Ms. Archuleta understood and had reason to know that the Vida Encantada staff gave her the paperwork to sign to set forth the terms of Ms. Lucero's admission into the home and the parties' respective duties.  *See, e.g.*, Aff. of Celia Archuleta (Doc. 9-1) ¶¶ 11, 22 (explaining that Ms. Vigil gave her the papers to sign and she remembered that the papers were mostly about the nursing home getting paid).  It is also undisputed that Ms. Lucero was admitted into Vida Encantada and received care and treatment services from Vida Encantada for nearly five years.  Ms. Lucero also made payments to Vida Encantada, facilitated by Ms. Archuleta, for those services for nearly five years.  The facts show that there was an offer, acceptance, mutual assent, and consideration at the time Ms. Archuleta signed the Admission Contract.  Because both parties acted as though the provisions of the contract were in force, the lack of a signature by an employee of Vida Encantada does not prevent Plaintiff Vida Encantada from enforcing the contract.  *Cf. Lopez-Silvero*, 827 So.2d at

339 (reversing and remanding with instructions to trial court to grant motion for arbitration, despite lack of signature by nursing home on written contract containing arbitration clause, where resident and nursing home acted as if there were a valid contract by admitting resident and providing him with care for over two months and nursing home signed other documents relating to admission).

### 2.    Ms. Archuleta Had Implied Actual Authority to Agree to Arbitration

The Estate is bound to arbitrate under the Arbitration Clause based on agency law.  Judge Black previously determined that Ms. Lucero impliedly gave Ms. Archuleta authority to admit Ms. Lucero to the nursing home.  *See* Mem. Op. (Doc. 52) at 3 ("While *Archuleta had implied authority to admit Lucero to a nursing home*, there is no evidence of Lucero's express or implied consent to her daughter's authority to agree to arbitration.") (emphasis added); Certification Order (Doc. 53) at 10 ("[T]here is evidence of Lucero's implied authorization to have Archuleta sign the admission contract on her behalf.  Lucero clearly desired to be admitted to the nursing home, and she routinely allowed her daughter to sign financial paperwork on her behalf.").  The only question that remains on this agency issue is whether the authority to admit another to a nursing home includes authority to sign an arbitration agreement contained within the admission paperwork.

The New Mexico Court of Appeals resolved this issue in the affirmative in *Barron v. The Evangelical Lutheran Good Samaritan Society*, 2011-NMCA-094, 265 P.3d 720.  In *Barron*, the resident of a nursing home gave her granddaughter authority, either expressly or in terms that were implied from words or conduct, to complete the paperwork to admit the resident into the nursing home.  *Id.* ¶¶ 17-18.  Although the arbitration clause was part of the paperwork, the plaintiff argued that the granddaughter's authority was limited such that she could not bind the

principal to arbitration.  *See id.* ¶ 19.  The Court of Appeals found significant that the arbitration clause was part of the admission document and the admission process; the plaintiff did not dispute the granddaughter's authority to complete any of the paperwork other than the arbitration clause; the record did not reflect that the resident manifested any interest in what was or was not contained in the paperwork; and there was no evidence indicating the resident objected to her granddaughter acting on her behalf or had placed any limitation on the granddaughter's acknowledged authority.  *See id.* ¶¶ 20, 22-23, 28.

The *Barron* court, discussing the split in authority on the issue, agreed with the courts that had concluded that agents with authority to admit their principals to medical facilities also had authority to sign arbitration agreements that were included in the admission paperwork as a related healthcare decision and an agent's authority to bind a principal to arbitration does not have to be specifically or separately granted.  *See id.* ¶¶ 26-28.  The New Mexico Court of Appeals explained:

> [W]e view Ms. Barron's words and actions as indicating that Ms. Barron was comfortable with Ms. Chapman making admission decisions on her behalf without herself knowing or being specifically advised about the dispute resolution issue. As the Admission Agreement and the admission process included a decision on the Resolution of Legal Disputes form, we view Ms. Chapman's authority as encompassing that decision.

*Id.* ¶ 28.

This case is not meaningfully different from *Barron*.  Although Ms. Lucero never gave express authorization to sign the paperwork, Ms. Lucero was mentally competent and gave implied authorization to Ms. Archuleta to sign the Admission Contract.  *See id.* ¶ 16 (explaining that principal may give actual authority to agent in terms that are implied from words or conduct or from circumstances of relationship).  Indeed, Ms. Archuleta admitted that she believed she had authority to enter the contract on her mother's behalf.  Based on all the evidence in the

record, Ms. Archuleta's belief was reasonable.  As in *Barron*, there is no evidence that Ms. Lucero objected to her daughter acting on her behalf or that Ms. Lucero ever limited her daughter's authority in any way.  The record reflects that Ms. Lucero never manifested any interest in the contents of the paperwork.  The Estate also does not challenge the validity of the entire admission contract, only the Arbitration Clause contained therein.  Def.'s Resp. (Doc. 9) at 4 n.1 ("Defendant does not challenge the validity of the entire admission contract, as the entirety of the admission contract is not at issue before either this court or the New Mexico state district court. . . . Rather, Defendant here specifically contests the enforceability of the arbitration clause.").  In light of these facts, Ms. Archuleta had the authority to accept the arbitration clause in the admission agreement on Ms. Lucero's behalf, and therefore, Ms. Lucero's Estate is bound by the Arbitration Clause signed by Ms. Archuleta.[1]

### 3.     The Arbitration Clause Did Not Terminate Upon Ms. Lucero's Death

Defendant additionally contends that the admission contract and the arbitration clause therein terminated upon Ms. Lucero's death based on the following contractual provision:  "If Patient/Resident passes away, this Contract shall terminate on the day of Patient/Resident's death."  Defendant asserts that a personal representative under the Wrongful Death Act has no cause of action until the injured person dies, and because the contract terminated upon Ms. Lucero's death, the Estate cannot be bound to the terms of the Arbitration Clause.

The Honorable Martha Vázquez considered and rejected a similar argument in *THI of New Mexico at Vida Encanta, LLC v. Lovato*, 848 F.Supp.2d 1309 (D.N.M. 2012), and this Court adopts her persuasive reasoning:

> Defendant brought her wrongful death claims against Plaintiffs under the New Mexico Wrongful Death Act ("the Act"), which provides in relevant part:

---

[1] Given the Court's resolution of this issue, it does not need to resolve whether the Estate is bound under the third-party beneficiary doctrine.

> Whenever the death of a person shall be caused by the wrongful act, neglect or default of another, ... and the act, or neglect, or default, is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured.

NMSA 1978, § 41-2-1.  The Act is "a survival statute [that] provides a cause of action for the benefit of the statutory beneficiaries to sue a tortfeasor for the damages, measured by the value of the decedent's life, *which the decedent [herself] would have been entitled to recover had death not ensued.*" *Romero v. Byers*, 117 N.M. 422, 872 P.2d 840, 846 (1994) (citation omitted; emphasis added). Thus, wrongful death claims are derivative of a decedent's rights, and a wrongful death beneficiary has no claim save those claims that the decedent herself would have had. *See Maestas v. Overton*, 86 N.M. 609, 526 P.2d 203, 204 (N.M. Ct. App. 1974) ("A literal reading of [the Act] gives the personal representative a cause of action, only if the decedent would have had one absent death."), *rev'd on other grounds,* 87 N.M. 213, 531 P.2d 947 (1975).

…

> Accordingly, while Defendant, as the personal representative of Ms. Duran's estate, had no cause of action until Ms. Duran died, her wrongful death claim nonetheless is derivative of, and limited in scope to, the claims that Ms. Duran would have had if she had lived. As discussed above, based on the terms of the Arbitration Agreement, Defendant is bound to submit those claims to arbitration.

*Id.* at 1327-28.  *See also Hogsett v. Hanna*, 63 P.2d 540, 543 (N.M. 1936) ("The determinative fact is whether or not Dr. Hogsett, if he had survived, could have maintained an action against the defendant for injuries received."); *Laizure v. Avante at Leesburg, Inc.*, __ So.3d __, No. SC 10-2132, 2013 WL 535417, at *7-8 & n.3 (Fla. Feb. 14, 2013) (citing split in authority but holding that, because nature of Florida wrongful death action is derivative, estate and heirs stand in shoes of decedent and are bound by arbitration agreement to which decedent would have been bound).

Had Ms. Lucero survived, she would have been subject to the Arbitration Clause, and

thus, the claims brought by her personal representative under the Wrongful Death Act are likewise limited by the Arbitration Agreement. The contractual language stating that the contract terminates upon Ms. Lucero's death also does not alter the fact that, had she lived, Ms. Lucero would have been subject to arbitration. The language of the Arbitration Clause clearly intended to encompass all claims then "existing or hereafter arising between the parties" in connection with the provision of healthcare services to Ms. Lucero. Admission Contract (Doc. 1-1) at 6 of 7. "Under the federal common law of arbitrability, an arbitration provision in a contract is presumed to survive the expiration of that contract unless there is some express or implied evidence that the parties intend to override this presumption . . . ." *Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.*, 157 F.3d 775, 781 (10th Cir. 1998). No such evidence is present here. As the Florida Supreme Court noted, "it would be anomalous to give greater rights to the estate and heirs than to the decedent." *Laizure*, 2013 WL 535417, at *8. Defendant derives her claims through Ms. Lucero, and thus, Defendant is equally bound to submit the claims of the Estate to arbitration.

### 4.     There was Consideration for the Arbitration Clause

Defendant argues that there was no consideration given for Ms. Archuleta signing the Arbitration Agreement, because Ms. Lucero had already been admitted and had received care for nine days. Defendant also contends that the federal government prohibits a nursing home from requiring a current resident to sign an arbitration agreement as a condition of continued residency, relying on a policy set forth by the Center for Medicaid and State Operations ("CMS") on January 9, 2003. The memorandum states: "A current resident is not obligated to sign a new admission agreement that contains binding arbitration. Federal regulations, at 42 C.F.R. § 483.12(a)(2) limit the circumstances under which a facility may discharge or transfer a

18

resident." Def.'s Resp., Ex. 4 (Doc. 9-4) at 2.

Consideration is a promise to do something that a party has no legal obligation to do or to forbear from doing something it has a legal right to do. *Talbott v. Roswell Hosp. Corp*., 2005-NMCA-109, ¶ 16, 118 P.3d 194. A valid contract requires that both sides provide consideration. *Heye*, 2003-NMCA-138, ¶ 12. Consideration is plainly present here where Ms. Lucero received care and treatment by the nursing home, and the nursing home received payments from Ms. Lucero. The Arbitration Clause was part of the original Admission Contract, not a separate document, and thus, separate consideration was not required. *See Thompson v. THI of New Mexico at Casa Arena Blanca, LLC*, No. Civ. 05-1331 JB/LCS, 2006 WL 4061187, at *12 (D.N.M. Sept. 12, 2006) (unpublished opinion) ("The arbitration provision is part of the underlying contract, and no additional consideration is necessary for enforcement of the provision."). Although there was a short delay between Ms. Lucero's admission and Ms. Archuleta's signing the written Admission Contract, the Admission Contract was the original agreement between the parties setting forth their respective duties and promises to one other. *Cf. Richards v. Allianz Life Ins. Co*., 2003-NMCA-001, ¶¶ 10, 20, 62 P.3d 320 (holding that new contract constituted substitution of earlier contracts, where there was no dispute that employer had right to terminate two pre-existing contracts, and thus continuation of relationship between parties was consideration for new contract). Defendant provides no authority to support the argument that the effect of the CMS memorandum is to require a nursing home to provide separate, additional consideration in order for an arbitration clause in the initial admissions contract to be valid. The Court therefore concludes that consideration supported the Admission Contract and Arbitration Clause contained therein. *See Pennington v. Northrop Grumman Space & Mission Sys. Corp.*, 269 Fed. Appx. 812, 819 (10th Cir. Mar. 14, 2008) (unpublished decision)

("In the employment context, a reciprocal agreement to arbitrate can provide the requisite consideration so long as the employer does not retain the unilateral authority to terminate or modify the arbitration agreement once the employee's claim has accrued."); *Sisneros v. Citadel Broadcasting Co*., 2006-NMCA-102, ¶ 34, 142 P.3d 34 (holding that, where agreement to arbitrate restricted employer's right to amend or terminate arbitration agreement, agreement was not illusory and mutual promise to arbitrate was consideration for arbitration agreement).

### 5.    THI-NM Can Enforce the Arbitration Clause, but FAS and FCC Cannot

Defendant next argues that that the Arbitration Clause cannot be enforced by any party other than Vida Encantada, the only plaintiff expressly listed as a party in the Admission Contract.  Defendant contends that Plaintiffs THI-NM, FAS, and FCC cannot enforce arbitration because they are not listed as parties to the agreement, and "Plaintiffs may not claim, on the one hand, that they are able to compel arbitration of disputes against them, based upon allegations of joint venture in Defendant's complaint, while simultaneously decrying any liability based upon that exact same theory." Def.'s Resp. (Doc. 9) at 15.  THI-NM, FAS, and FCC counter that they can compel arbitration because they are third-party beneficiaries of the Arbitration Agreement, which subjects to arbitration claims "whereby the other party or its *agents*, employees or *representatives* may be liable."   Admission Contract (Doc. 1-1) at 6 of 7 (emphasis added). Alternatively, THI-NM, FAS, and FCC contend the doctrine of equitable estoppel allows them to compel arbitration.

#### a.    THI-NM is a Third-Party Beneficiary of the Arbitration Agreement, but not FAS or FCC

A third-party beneficiary of an arbitration contract can compel arbitration under the contract.  *Cf. Fleet Mortg. Corp. v. Schuster*, 811 P.2d 81, 82 (N.M. 1991).  The party claiming

to be a third-party beneficiary has the burden to show that the parties to the contract intended to benefit him. *Fundamental Administrative Services, LLC v. Patton*, Nos. 12-2014, 12-2065, 2012 WL 5992259, at \*3 (10th Cir. Dec. 3, 2012) (unpublished opinion) (quoting *Tarin's, Inc. v. Tinley*, 3 P.3d 680, 686 (N.M. Ct. App. 1999)). "'Such intent must appear either from the contract itself or from some evidence that the person claiming to be a third party beneficiary is an intended beneficiary.'" *Id.* (quoting *Schuster*, 811 P.2d at 83). Consequently, if THI-NM, FAS, and FCC can show that they are "agents, employees or representatives" within the meaning of the Arbitration Clause, they can enforce the terms of the agreement under the third-party beneficiary doctrine. Plaintiffs assert that THI-NM is a "representative" of Vida Encantada and FAS and FCC are "agents" of Vida Encantada.

None of the terms is defined in the Admission Contract. The common meanings of terms may be ascertained from a dictionary. *Battishill v. Farmers Alliance Ins. Co.*, 2006-NMSC-004, ¶¶ 8-9, 127 P.3d 1111 (relying on Webster's Third New International Dictionary to define contract terms). The American Heritage Dictionary of the English Language defines "agent" as "[o]ne that acts or has the power or authority to act" or "[o]ne empowered to act for or represent another." American Heritage Dictionary of the English Language 32 (4th ed. 2006). The Oxford English Dictionary offers these additional definitions of "agent": "one who undertakes negotiations or transactions on behalf of a superior, employer, or principal," and in commercial use, "a person or company that provides a particular service, typically one that involves arranging transactions between two other parties." Agent Definition, Oxford English Dictionary, http://www.oed.com/view/Entry/3859?rskey=lQJkyp&result=1&isAdvanced=false#eid (last visited April 22, 2013). *See also Regents of Univ. of New Mexico v. Lacey*, 764 P.2d 873, 875 (N.M. 1988) ("An attorney is an agent or one who is appointed and authorized to act in the place

or stead of another.") (citing Black's Law Dictionary 117 (5th ed. 1979)).  A "representative" is defined as "[o]ne that serves as a delegate or agent for another," American Heritage Dictionary of the English Language at 1481, or as "a person who stands for, speaks, or acts on behalf o[f] another person . . ., typically in an official capacity," Representative Definition, Oxford English Dictionary,   http://www.oed.com/view/Entry/163003?redirectedFrom=representative#eid.   (last visited April 22, 2013).  *See also* Black's Law Dictionary ("representative") (9th ed. 2009) ("One who stands for or acts on behalf of another"); *Lacey*, 764 P.2d at 875 ("A legal representative, defined in its broadest sense, is one who stands in place of another and represents the interests of another; a person who oversees the legal affairs of another.") (citing Black's Law Dictionary 807 (5th ed. 1979)).

THI-NM does not dispute, for purposes of this motion, the Estate's allegations in the State Court Complaint that THI-NM is "in the business of owning, operating, managing, and/or maintaining nursing homes and related healthcare facilities, including Vida Encantada," and that the causes of action arise out of such business conducted by THI-NM in the ownership, operation, management and/or control of Vida Encantada.  State Court Compl. (Doc. 1-2) ¶ 5.  It is also undisputed that THI-NM is the sole member and sole shareholder of Vida Encantada.  *See* Pls.' Am. Supp. Mem. (Doc. 64) at 8-9 & n.7; State Court Compl. (Doc. 1-2) ¶ 15.  Based on these undisputed facts, THI-NM constitutes a "representative" of Vida Encantada, because THI-NM represents the interests of Vida Encantada, oversees its affairs, and acts on behalf of Vida Encantada.  Accordingly, THI-NM is within the ambit of entities against whom Ms. Lucero's rights to bring certain claims in a court of law were waived.

Turning to FAS, the parties do not dispute that Plaintiff FAS is a corporation "engaged in the business of owning, operating, managing, and/or maintaining nursing homes and related

healthcare facilities, including Vida Encantada," and that the causes of action arise out of such business conducted by FAS in the ownership, operation, management and/or control of Vida Encantada.  State Court Compl. (Doc. 1-2) ¶ 10.  It is also undisputed that all nursing home facilities that contract with FAS, including Vida Encantada, have a "contract for services with FAS" whereby FAS receives a management fee of 4% of net operating revenue of each nursing home with which it contracts, and that it calculates the fees that are owed from the facilities it serves and pays the vendors, rent, and all operating expenses for the facilities.  *Id.* ¶ 11. Although these facts establish that FAS performs services that benefit Vida Encantada, the facts do not demonstrate that Vida Encantada is the principal controlling or authorizing FAS's actions, as necessary for FAS to be the agent.  *See Barron*, 2011-NMCA-094, ¶ 16 ("Actual authority is given to the agent *by the principal* . . . .  A principal is bound by the acts of his or her agent within the agent's actual designated authority and is also bound by the acts of the agent that the principal holds the agent out to the public as possessing.") (internal quotations omitted) (emphasis added).  Indeed, the definition of "agent" urged by Plaintiffs is "one that acts for or in the place of another *by authority from him*."  Pls.' Am. Supp. Mem. (Doc. 64) at 11 (quoting Webster's Third New International Dictionary 40 (2002)) (emphasis added).  Significantly, the undisputed facts indicate FAS owns, operates, manages, and/or maintains Vida Encantada, suggesting that FAS has the authority over Vida Encantada, not the other way around.  The contract that sets forth FAS's duties is not part of the record, and thus, this Court is unable to determine whether FAS is the agent for Vida Encantada, or some other entity. Notably, the State Court Complaint lists a number of entities that are in the business of owning, operating, managing, and/or maintaining nursing homes, including Vida Encantada, such as THI-NM, THI-Baltimore, Inc., THI-Holdings, LLC, and Fundamental Long-Term Care Holdings, LLC.  State

Court Compl. (Doc. 1-2) ¶¶ 5, 7, 9, 14.  Plaintiffs have not met their burden of establishing that FAS is Vida Encantada's agent, rather than an agent of one of these other entities.

Likewise, FCC, according to the undisputed facts set forth in the State Court Complaint, is in the business of providing consulting services to nursing homes and related healthcare facilities, including Vida Encantada, and FCC employs the Regional Director of Operations who is in charge of advising Vida Encantada about how to increase profits and meet budget expectations. *Id.* ¶¶ 12-13.  FCC receives a management fee of 1% of net operating revenue for each nursing home with which it contracts.  *Id.* ¶ 13.  Once again, although FCC performs services for Vida Encantada by providing them with advice, the record is not clear that Vida Encantada is the principal controlling or authorizing FCC's actions, rather than another entity.  It is not clear whether Vida Encantada is subject to the authority of FCC, or the other way around. After all, FCC's advice to Vida Encantada may be mandatory, rather than discretionary.

In sum, the hierarchy and relationships between the various entities are not sufficiently clear to find as a matter of law that Vida Encantada is the principal who gave authority to FAS and FCC to act as an agent on its behalf.  Plaintiffs chose to rely on the ambiguous allegations of the State Court Complaint, rather than providing affirmative evidence of the relationships between themselves and Vida Encantada -- evidence plainly within their possession -- presumably due to litigation strategy in the underlying case.  Plaintiffs have thus not meet their burden to show that FAS or FCC were intended third-party beneficiaries of the Arbitration Agreement.  Plaintiffs, however, did meet their burden of showing that THI-NM is a third-party beneficiary of the Arbitration Agreement, and thus, THI-NM can compel arbitration under that agreement.

**b.     Equitable estoppel does not apply**

THI-NM, FAS, and FCC additionally contend that they can compel arbitration based on two alternative equitable estoppel grounds: (1) where a signatory alleges substantially interdependent and concerted misconduct by both another signatory and a non-signatory, or (2) where a signatory relies on the terms of the contract in making a claim against a non-signatory. This Court, however, has previously rejected these same arguments in *THI of New Mexico at Hobbs Center, LLC v. Patton*, No. Civ. 11-537 LH/CG, 2012 WL 112216, at *8 (D.N.M. Jan. 3, 2012) (unpublished opinion) and incorporates those reasons herein:

> As the Tenth Circuit recently explained, however, allegations of joint conduct between a defendant signatory and a defendant nonsignatory alone are not enough to estop a claimant from avoiding arbitration with the nonsignatory. *See [Lenox MacLaren Surgical Corp. v.] Medtronic, [Inc.*, No.11-1251,] 2011 WL 5545420, at *6 [(10th Cir. Nov. 15, 2011) (unpublished opinion)]. "[A]llegations of collusion will support estoppel only when they establish that the claims against the nonsignatory are intimately founded in and intertwined with the obligations imposed by the contract containing the arbitration clause." *Id.* (internal quotations omitted). "The linchpin for equitable estoppel is equity-fairness." *Id.* (quoting *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)). "The plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel." *Id.* Similarly, with respect to the second alternative ground asserted by Plaintiffs FAS and FCC, reliance on the contract is key – equitable estoppel only applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the agreement in asserting its claims against the non-signatory. *See id.* at *4; *American Bankers Ins. Group, Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006) (citing *MS Dealer [Serv. Corp. v. Franklin]*, 177 F.3d [942, 948 (11th Cir. 1999)]). Arbitration is appropriate under this second equitable estoppel ground when each of the signatory claimant's causes of action against a non-signatory "are intertwined with the contract." *See Murken[v. Suncor Energy, Inc.]*, 2005-NMCA-102, ¶ 9[, 138 N.M. 179].

*Id.* at * 14.

As in the *Patton* case, the Estate has brought actions against THI-NM, FAS, and FCC for negligence and misrepresentation. These underlying state claims, and the duties allegedly breached by THI-NM, FAS, and FCC, arise from state tort law, not the Admission Contract.

Because the Estate's claims against THI-NM, FAS, and FCC are not intimately founded in or intertwined with the obligations contained in the Admission Contract, THI-NM, FAS, and FCC cannot compel Defendant to arbitrate its claims against them based on the concerted misconduct equitable estoppel ground. For similar reasons, the second equitable estoppel ground asserted by THI-NM, FAS, and FCC cannot provide them relief. The Estate is not relying on the terms of the Admission Contract in asserting its claims against THI-NM, FAS, and FCC, and thus, it would not be unfair to allow the Estate to avoid arbitrating its claims with them under the equitable estoppel doctrine. *See Medtronic*, 2011 WL 5545420, at *6; *Patton*, 2012 WL 112216 at *13-16. FAS and FCC therefore cannot compel arbitration.

### B.   Unconscionability

Defendant seeks to avoid application of the Arbitration Clause on grounds that it is unconscionable. Unconscionability is an equitable doctrine that allows courts to render unenforceable an agreement that is unreasonably favorable to one party while precluding a meaningful choice of the other party. *Rivera v. American Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 43, 259 P.3d 803. Unconscionability is analyzed from both substantive and procedural perspectives. *Id.* A contract may be rendered unenforceable under either substantive or procedural unconscionability, or a combination of both. *Id.* ¶ 47. The two perspectives have an inverse relationship: "[t]he more substantively oppressive a contract term, the less procedural unconscionability may be required for a court to conclude that the offending term is unenforceable." *Cordova v. World Finance Corp. of New Mexico*, 2009-NMSC-021, ¶ 24, 208 P.3d 901.

### 1.   Substantive Unconscionability

Substantive unconscionability focuses on the legality and fairness of the contract terms,

including concerns such as the commercial reasonableness and fairness of the terms, the purpose and effect of the terms, and the one-sidedness of the terms. *Rivera*, 2011-NMSC-033, ¶ 45. A contract term is substantively unconscionable if it is "grossly unreasonable" and against public policy. *Id.* (quoting *Cordova*, 2009-NMSC-021, ¶¶ 22, 31). In other words, contract terms that "unreasonably benefit one party over another are substantively unconscionable." *Id.* ¶ 46 (quoting *Cordova*, 2009-NMSC-021, ¶ 25).

Defendant argues the Arbitration Clause is substantively unconscionable because it names the NHLA, now the American Health Lawyers Association ("AHLA"), as the arbitral body to resolve the claims, and the AHLA has a number of allegedly unfair procedures. First, Defendant asserts the AHLA imposes unreasonable costs, albeit equally divided among the parties, such as approximately $2,912 to request a list of potential arbitrators, hourly rates for arbitrators of between $150 and $450 resulting in a week-long hearing costing between $6,000 and $18,000, and travel expenses for out-of-state arbitrators. The AHLA also permits the arbitrator, upon a determination of good cause, to impose costs and compensation in favor of the prevailing party. Plaintiffs argue that this issue is moot because Vida Encantada agrees to pay the AHLA administrative costs in this matter.

Where a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs. *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000). In light of Vida Encantada's admission that it will pay all administrative costs, the Estate cannot show it will incur prohibitively high costs. Nor does the record reflect that the costs of arbitration are prohibitively high, especially relative to court litigation costs. After all, the New Mexico Court of Appeals has recognized "there are advantages to arbitration which, among other

benefits, are that it generally costs less than litigation and leads to a quicker resolution." *Barron*, 2011-NMCA-094, ¶ 41.

Second, Defendant contends that the pool of arbitrators is unfair and not neutral because it is a panel maintained by the AHLA service. Defendant argues, without evidentiary support in the record, that the panel is comprised largely of attorneys who specialize in the defense of nursing home or medical malpractice litigation. This record is insufficient for the Court to conclude that the AHLA is unlikely to provide a neutral and fair forum. *Cf. THI of New Mexico at Hobbs Center, LLC v. Spradlin*, No. Civ. 11-792 MV/LAM, 2012 WL 4466639, at *10 (D.N.M. Sept. 25, 2012) (unpublished decision) (rejecting speculative, unsupported argument that NHLA is unlikely to provide neutral and fair arbitrators). Moreover, the AHLA rules provide for protections to ensure arbitrators are fair and impartial. The AHLA has created a Code of Ethics for Arbitrators requiring them to be honest, fair and impartial, and to disclose to the parties conflicts of interest. *See* Pls.' Reply, Ex. A (Doc. 20-1) at 4-5 of 7; Def.'s Resp., Ex. 3 (Doc. 9-3) at 9 of 17. Parties also have an opportunity to strike the name of one arbitrator from the list provided by the AHLA, rank the remaining arbitrators in order of preference, and request a second list of arbitrator names to be evaluated in combination with the first list. Def.'s Resp., Ex. 3 (Doc. 9-3) at 8 of 17. "The FAA also protects against bias, by providing that courts may overturn arbitration decisions '[w]here there was evident partiality or corruption in the arbitrators.'" *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30-31 (quoting 9 U.S.C. § 10(b)). Defendant has not established that these provisions are inadequate to guard against potential bias. *Cf. id.* (holding that there was no showing that provisions in NYSE arbitration were inadequate to guard against bias where rules required arbitrators to disclose their employment histories and any conflicts of interest, parties had one peremptory challenge and

unlimited challenges for cause, and FAA allows for removal of partial arbitrators).

Finally, Defendants argue that the Arbitration Clause is substantively unconscionable because Section 6.06 limits the award of punitive damages, among other damages, to a standard of "clear and convincing evidence," in contrast to the preponderance of the evidence standard in New Mexico law. Section 1.05, however, provides: "Except as provided in Section 1.01, the parties may vary or interpret these Rules as they see fit by written agreement between or among all of them. The provisions of these Rules and any exceptions thereto are subject to applicable law." Plaintiffs concede that the controlling standard for damages, even in the arbitral forum, is preponderance of the evidence in New Mexico. Defendant's argument thus fails.

### 2.  Procedural Unconscionability

Procedural unconscionability, by contrast, "examines the particular factual circumstances surrounding the formation of the contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other." *Rivera*, 2011-NMSC-033, ¶ 44 (quoting *Cordova*, 2009-NMSC-021, ¶ 23). When determining procedural unconscionability, a court should look at whether the contract is one of adhesion, a standardized contract offered by a party with superior bargaining strength to a weaker party on a take-it-or-leave-it basis, without opportunity for bargaining. *Id.*

Defendant argues that Ms. Archuleta was in a greatly diminished bargaining position where she did not understand the arbitration clause, she did not feel free to decline the terms demanded, and Ms. Lucero had been living in the facility for nine days already. Ms. Archuleta's subjective feeling of not being free to decline arbitration terms is not enough to demonstrate procedural unconscionability. A contract is procedurally unconscionable "only where the inequality is so gross that one party's choice is effectively non-existent." *Guthmann v. LaVida*

29

*Llena*, 103 N.M. 506, 510 (1985), *overruled on other grounds by Cordova*, 2009-NMSC-021, ¶ 31.  Factors in this analysis include the use of high pressure tactics; the relative education, sophistication, or wealth of the parties; and the relative scarcity of the subject matter of the contract.  *Id.*

While the Admission Contract is standardized and uses legalistic terms and Ms. Archuleta has only a high school education, the evidence does not show that the circumstances were so grossly unequal to sustain a finding of procedural unconscionability.  Unequal bargaining power alone is not sufficient to find an arbitration agreement unenforceable.  *See AT&T Mobility, LLC v. Concepcion*, __ U.S. __, 131 S.Ct. 1740, 1749 n.5 (2011); *Gilmer*, 500 U.S. at 33.  Ms. Lucero made the decision that she needed long-term care and approved the decision to remain at Vida Encantada because she wanted to live near her family.  The record does not show that there were no other suitable long-term care facilities available in the area.  Rather, at least one facility in Las Vegas, Meadows, was available, but Ms. Archuleta did not prefer it.  Moreover, although Ms. Vigil did not specifically point out the Arbitration Clause and explain it to Ms. Archuleta, the arbitration clause was labeled "ARBITRATION" in bold, capital letters directly above the signature lines.  Each party to a contract has a duty to read and familiarize herself with its contents before signing it, and thus, a party who executes and enters a written contract is presumed to know the terms of the agreement and to have agreed to each of its provisions in the absence of fraud, misrepresentation, or some other wrongful act.  *See Smith v. Price's Creameries*, 650 P.2d 825, 829 (N.M. 1982).  There is no evidence here of any high-pressure tactics, fraud, misrepresentation, or other wrongful act by Vida Encantada.  Nor is there evidence that Ms. Archuleta ever told anyone she did not understand the Admission Contract or request clarification of its terms.  Defendant has therefore not shown procedural

unconscionability.

In sum, Defendant has not met her burden of showing that the Arbitration Clause is either substantively or procedurally unconscionable. *Cf. Spradlin*, 2012 WL 4466639, at *10 (holding that identical arbitration agreement in nursing home admission contract was not procedurally unconscionable, even though patient's representative who signed contract had 11th grade education and felt rushed, because there was no evidence that nursing home had superior bargaining position, staff acted wrongfully, or representative had no opportunity to negotiate); *Thompson*, 2006 WL 4061187, at **2, 14 (holding identical arbitration agreement in nursing home contract was not procedurally or substantively unconscionable).

## V.      CONCLUSION AND RELIEF

Plaintiffs have satisfied their burden of establishing an agreement to arbitrate that binds Defendant and Plaintiffs Vida Encantada and THI-NM.  Based on the record, the Court cannot conclude that the Arbitration Clause is substantively or procedurally unconscionable.  It also is undisputed that all the causes of action brought by the Estate in the State Court Action fall within the broad scope of arbitrable claims within the Arbitration Agreement and that the transaction involves interstate commerce.  The Court will thus, under Section 4 of the FAA, compel Defendant to arbitrate her state claims against Plaintiffs Vida Encantada and THI-NM.  Plaintiffs FAS and FCC have not met their burden of demonstrating that they can compel arbitration under the agreement, and thus, the Court will not compel Defendant to arbitrate the state claims against Plaintiffs FAS and FCC.

Additionally, Plaintiffs move to stay this proceeding under Section 3 of the FAA, and to stay Defendant's State Court Action under the All Writs Act, 28 U.S.C. § 1651, and the Anti-Injunction Act, 28 U.S.C. § 2283.  The Court will not stay these two proceedings for the reasons

set forth in this Court's prior decision of *Patton*, 2012 WL 112216, at *23-24.

        **IT IS THEREFORE ORDERED** that Plaintiffs' Motion to Compel Arbitration (**Doc. 2**) is **GRANTED** in part and **DENIED** in part as follows:

        1.    Plaintiffs' request to compel arbitration is **GRANTED** as to Defendant's claims asserted in the State Court Action against Plaintiffs THI of New Mexico at Vida Encantada, LLC, and THI of New Mexico, LLC, but is **DENIED** as to Defendant's claims asserted in the State Court Action against Plaintiffs Fundamental Administrative Services, LLC, and Fundamental Clinical Consulting, LLC.

        2.    This Court **ORDERS** Defendant to arbitrate the claims asserted in the State Court Action against Plaintiffs THI of New Mexico at Vida Encantada, LLC, and THI of New Mexico, LLC, in accordance with the terms of the Arbitration Clause.

        3.    Plaintiffs' request for an order to stay Defendant's State Court Action is **DENIED**.

        4.    Plaintiffs' request to stay this proceeding is **DENIED**.

        5.    This case is therefore **DISMISSED**.

 

_____

**SENIOR UNITED STATES DISTRICT JUDGE**